UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

MARQUITOS MAURICE WHITELAW,

      Plaintiff,

  v.                                          Case No. 16-C-982

BRIAN FOSTER, *et al.*,

      Defendants.

---

## DECISION AND ORDER GRANTING SUMMARY JUDGMENT

---

Plaintiff Marquitos Maurice Whitelaw, an inmate serving a state prison sentence, filed this action under 42 U.S.C. § 1983, alleging that Defendants Brian Foster, Anthony Meli, Jeremy Westra, Paul Ludvigson, Joel Sankey, and Teresa McLaren violated his constitutional rights by failing to protect him from a gang attack. Although Whitelaw is currently incarcerated at Wisconsin Secure Program Facility, the events underlying his complaint occurred while he was housed at Waupun Correctional Institution (WCI). This matter comes before the court on the defendants' motion for summary judgment. ECF No. 46. Whitelaw did not file a response to defendants' motion within thirty days as required by Civil Local Rule 56(b)(2), and he has not requested additional time to file a response. This alone is grounds to grant the motion. Civil L.R. 7(d) ("Failure to file a memorandum in opposition to a motion is sufficient cause for the Court to grant the motion."). For this reason and based on the undisputed facts before the court, it is clear the defendants are entitled to judgment as a matter of law. The defendants' motion for summary judgment will therefore be granted.

**BACKGROUND**

At all times relevant to this case, Whitelaw was housed at WCI, and the defendants in this case were all staff members there. Defendant Foster was the warden of WCI. Def.'s Proposed Findings of Fact (DPFOF) ¶ 1, ECF No. 48; *see also* ECF No. 51 ¶ 2.[1] Defendant Meli was the security director. DPFOF ¶ 2; *see also* ECF No. 50 ¶ 2. Defendant Westra was the captain in charge of Special Placement Needs. DPFOF ¶ 3; *see also* ECF No. 49 ¶ 2. Defendant Sankey was a corrections sergeant. DPFOF ¶ 3; *see also* ECF No. 54 ¶ 2. Defendant Ludvigson was a corrections program supervisor. DPFOF ¶ 5; *see also* ECF No. 55 ¶ 2. Defendant McLaren was a psychological associate in the Psychological Services Unit (PSU). DPFOF ¶ 6; *see also* ECF No. 52 ¶ 2. All defendants except for Ludvigson were employed at WCI through the date the defendants filed their motion for summary judgment; Ludvigson remains employed by the Wisconsin Department of Corrections (DOC). DPFOF ¶¶ 1–6; *see also* ECF No. 55 ¶ 2.

The events underlying Whitelaw's complaint occurred during May and June of 2016. Whitelaw was scheduled to be transferred from the Restrictive Housing Unit (RHU) to the South Cell Hall on May 19, 2016. DPFOF ¶ 7; *see also* ECF No. 50-1. Before leaving the RHU, Whitelaw told Defendants Sankey and Ludvigson that he feared gang members would attack him in the South Cell Hall. DPFOF ¶¶ 8, 12–13; *see also* ECF No. 55 ¶ 6; ECF No. 54 ¶ 6. Although Sankey asked Whitelaw for details about which gang or which individual inmates he feared would

---

[1] All of the background facts come from the defendants' proposed findings of fact. Whitelaw has failed to respond to defendants' motion for summary judgment in compliance with Civil Local Rule 56(b)(2). Therefore, all facts within defendants' proposed findings of fact that are properly supported will be deemed admitted. *Smith v. Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the non-movant as mandated by the local rules results in an admission.").

attack him, Whitelaw refused to provide any specific information. DPFOF ¶¶ 8–9; *see also* ECF No. 54 ¶¶ 6, 13. When Ludvigson similarly asked Whitelaw for information about the perceived threat, Whitelaw likewise refused to provide details such as inmate names or gang affiliations. DPFOF ¶¶ 13–15; *see also* ECF No. 55 ¶¶ 5–6.

Instead of providing the requested details to Sankey or Ludvigson, Whitelaw threatened to harm himself if he were required to move to South Cell Hall. DPFOF ¶ 17; *see also* ECF No. 54 ¶¶ 8–9. In response, Sankey contacted the PSU and spoke with Defendant McLaren, who made two visits to the RHU to evaluate Whitelaw. DPFOF ¶¶ 18–19; *see also* ECF No. 54 ¶ 9; ECF No. 52 ¶¶ 6–8; ECF No. 52-1. McLaren determined that Whitelaw did not need additional psychological care. DPFOF ¶ 21; *see also* ECF No. 52 ¶ 10. McLaren's notes from her second visit record her awareness that Whitelaw "wanted protective custody from gang members." DPFOF ¶ 19; *see also* ECF No. 52-1 at 3. Consistent with her general practice of reporting inmate safety issues to security staff, McLaren spoke with Sankey regarding Whitelaw's concern that gang members might pose a threat to his safety. DPFOF ¶¶ 19–22; *see also* ECF No. 55 ¶ 11; ECF No. 52 ¶ 8; ECF No. 52-1 at 3.

Ultimately, in the absence of specific information regarding Whitelaw's safety concerns, Sankey and Ludvigson informed Whitelaw that he would have to transfer to the South Cell Hall. DPFOF ¶¶ 11, 15, 17, 23–24; *see also* ECF No. 54 ¶¶ 10–12. Notably, Sankey believed that Whitelaw would initially be placed on cell confinement upon his transfer to South Cell Hall—meaning he would not be allowed to go to the dining hall or recreation—as part of the disciplinary disposition for a conduct report. DPFOF ¶ 24; *see also* ECF No. 54 ¶¶ 10–11; ECF No. 52-1 at 3.

3

At the time of the transfer, Sankey also reminded Whitelaw that, if he had safety concerns about his placement in South Cell Hall, he could submit a Special Placement Needs (SPN) request. DPFOF ¶ 25; *see also* ECF No. 54 ¶ 10. The DOC uses the SPN process to physically separate inmates from prison staff, other inmates, or facilities with which they may have an issue. DPFOF ¶ 29; *see also* ECF No. 49 ¶ 6. An inmate's SPN request creates a database entry that allows the DOC to track separation alerts across the Wisconsin prison system. *See* DPFOF ¶ 33; *see also* ECF No. 49 ¶ 14. Prison officials evaluating an SPN request consider the motivation for the threats being made and evaluate the present threat level. DPFOF ¶ 31; *see also* ECF No. 49 ¶ 11. The inmate who makes an SPN request must provide specific, verifiable information to obtain the requested separation. DPFOF ¶ 32; *see also* ECF No. 49 ¶ 11. Defendant Westra is WCI's designated SPN captain, which means that inmates making an SPN request must submit a written request for him to review. DPFOF ¶ 30; *see also* ECF No. 49 ¶¶ 4, 9. In turn, as security director Defendant Meli reviews Westra's SPN decisions. DPFOF ¶¶ 30, 48; *see also* ECF No. 50 ¶ 6. As warden, Defendant Foster is not involved in the SPN process. DPFOF ¶ 63; *see also* ECF No. 51 ¶ 4. Whitelaw did not submit any SPN requests after he was transferred from the RHU. DPFOF ¶ 38; *see also* ECF No. 49 ¶ 20.

On June 6, 2016, Whitelaw was involved in a fight with another inmate. DPFOF ¶ 43; *see also* ECF No. 49 ¶ 1; ECF No. 50-2. A conduct report issued to Whitelaw for the fight includes a narrative by a non-defendant correctional officer who observed it. ECF No. 50-2. The officer noted that, because both inmates were "out of assigned areas prior to the fight, [he was] led to believe this fight had been preplanned." *Id.* Before the June 6 fight, Whitelaw never informed any defendant that the particular inmate with whom he fought might pose a threat to Whitelaw's safety. DPFOF

4

¶¶ 9, 13, 19, 38, 48–51, 64. In particular, Whitelaw never pursued an SPN request or submitted any correspondence to the warden's office regarding his safety concerns prior to the fight. DPFOF ¶¶ 50–51; *see also* ECF No. 51 ¶ 6; ECF No. 50 ¶ 11; ECF No. 49 ¶ 21. Following the fight, however, Whitelaw filed multiple inmate complaints and submitted Interview/Information Request forms to both Foster and Meli, which provided both defendants with their first notice of Whitelaw's safety concerns. DPFOF ¶¶ 48–64.

## LEGAL STANDARD

Under the Federal Rules of Civil Procedure, summary judgment is proper if the pleadings, depositions, answers to interrogatories, and admissions on file, together with any affidavits, show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986).

## DISCUSSION

Whitelaw alleges that the defendants violated his constitutional rights by failing to protect him from gang members during the weeks before his June 6, 2016 fight. A plaintiff may prevail on a claim for relief under 42 U.S.C. § 1983 by showing that he was (1) deprived of a federal right (2) by a person acting under color of state law. *Gomez v. Toledo*, 446 U.S. 635, 640 (1980). The Eighth Amendment's prohibition on cruel and unusual punishment "requires prison officials 'to protect prisoners from violence at the hands of other prisoners.'" *Brown v. Budz*, 398 F.3d 904, 909 (7th Cir. 2005) (quoting *Farmer v. Brennan*, 511 U.S. 825, 833 (1994)). Accordingly, an inmate

5

may succeed on a failure to protect claim by showing that "(1) 'he is incarcerated under conditions posing a substantial risk of serious harm,' and (2) defendant-officials acted with 'deliberate indifference' to that risk." *Id.* (quoting *Farmer*, 511 U.S. at 834). The Seventh Circuit has elaborated on the nature of the failure to protect standard:

> "Because officials have taken away virtually all of a prisoner's ability to protect himself, the Constitution imposes on officials the duty to protect those in their charge from harm from other prisoners." Yet, a prison official does not violate the Eighth Amendment every time an inmate gets attacked by another inmate. Prisons, after all, are dangerous places often full of people who have demonstrated aggression. And so, an inmate has no claim "unless the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." The deliberate indifference test therefore has both objective and subjective prongs, the former requiring a grave risk and the latter requiring actual knowledge of that risk. Once prison officials know about a serious risk of harm, they have an obligation "to take reasonable measures to abate it." Of course, an official's response may be reasonable even if it fails to avert the harm.

*Dale v. Poston*, 548 F.3d 563, 569 (7th Cir. 2008) (citations omitted). To prevail on his failure to protect claim against any particular defendant, Whitelaw must therefore show that the defendant knew of a serious risk of harm to him and failed to take reasonable action to prevent that harm. The undisputed record, however, does not support a finding of failure to protect with regard to any of the six defendants in this case.

**A. Corrections Sergeant Joel Sankey**

Sankey became aware of a possible risk to Whitelaw on May 19, 2016, when Whitelaw informed Sankey that he feared he would be attacked by gang members following a scheduled move from the RHU to the South Cell Hall. DPFOF ¶¶ 7–8. In response to this information, Sankey followed his usual practice of asking for additional information—particularly details about which gang or gang members Whitelaw feared—so that Sankey could report the potential risk of harm to

his supervisor. *Id.* ¶¶ 8–11. Whitelaw, however, failed to identify for Sankey any gang or individual gang members who he feared were likely to cause him harm. *Id.* ¶¶ 9. Absent concrete information regarding the alleged threat, Sankey reminded Whitelaw that he had the option to file an SPN request with the supervisor in the South Cell Hall. *Id.* ¶ 25. Because Whitelaw failed to inform Sankey about a particular gang or specific gang members he feared, Sankey never obtained the subjective knowledge of a serious risk of harm necessary for Whitelaw to prevail on his failure to protect claim.

Moreover, the actions that Sankey did take were reasonable in proportion to the knowledge he actually possessed. *See Dale*, 548 F.3d at 569 ("[A]s the vagueness of a threat increases, the likelihood of 'actual knowledge of impending harm' decreases. So, too, does the official's ability to respond. The ultimate measure of the adequacy of the response is therefore reasonableness in light of the surrounding circumstances." (citation omitted) (quoting *Fisher v. Lovejoy*, 414 F.3d 659, 662 (7th Cir. 2005))). Not only did Sankey lack knowledge of the details surrounding any threat to Whitelaw, he also reasonably believed that Whitelaw did not face a serious risk of harm upon transfer. Sankey believed Whitelaw would initially be confined to his cell following the transfer, and he reminded Whitelaw about the option to file an SPN request to obtain protection. As a result, it was reasonable for Sankey to believe that the safety measures in place following Whitelaw's transfer were commensurate to the non-specific risk of harm that Whitelaw brought to his attention. Because Sankey's actions were therefore reasonable relative to the information he actually possessed, Whitelaw's failure to protect claim against him cannot succeed.

## B. Corrections Program Supervisor Paul Ludvigson

Ludvigson learned about Whitelaw's generalized safety concerns at the same time as Sankey on May 19, 2016. DPFOF ¶ 12. Like Sankey, Ludvigson asked Whitelaw to provide verifiable

7

details, such as names of individuals or their gang affiliations, but Whitelaw declined to give him the requested information as well. *Id.* ¶ 13. Without more precise details about the alleged threat, Ludvigson did not have the information necessary to conduct a more comprehensive investigation regarding Whitelaw's safety. *Dale*, 548 F.3d at 570 (discussing a prisoner's failure to provide follow-up details about alleged threats of harm and concluding that the court could not "emphasize enough the prisoner's responsibility to furnish information in these situations"). Asking follow-up questions was a reasonable response to the vague risk of harm that Whitelaw brought to Ludvigson's attention, indicating that Ludvigson cannot be liable on a failure to protect theory for the knowledge he did possess. Furthermore, Whitelaw's inaction—in the form of his refusal to provide details about the perceived threats—prevented Ludvigson from obtaining additional information about the nature of the alleged risk of harm to Whitelaw. Ludvigson's subsequent lack of action following Whitelaw's transfer to the South Cell Hall therefore does not constitute failure to protect, either.

## C. Psychological Associate Teresa McLaren

McLaren learned of Whitelaw's concerns about threats to his safety after Sankey called the PSU in response to Whitelaw's threat to harm himself rather than be transferred to the South Cell Hall. DPFOF ¶¶ 18–19. Specifically, McLaren became generally aware that Whitelaw desired protection from gang members during two visits to the RHU to evaluate him. *Id.* ¶ 19. Although McLaren does not have control over security measures such as inmate movement or cell assignments, she did not ignore Whitelaw either; instead, she spoke with Sankey, who confirmed that he and the security staff were aware of Whitelaw's general safety concerns but had concluded that Whitelaw was not in danger at that time. *Id.* ¶¶ 20–22. In light of her medical role and accompanying lack of security responsibility, McLaren reasonably relayed Whitelaw's safety

8

concerns to prison security staff better positioned to address any threats of harm from gang members, and she received assurances that Whitelaw was not in peril. Because McLaren never possessed knowledge of specific threats of harm to Whitelaw and acted reasonably in response to the minimal knowledge she did possess, the record does not support a failure to protect claim against her.

**D. Captain Jeremy Westra, Security Director Anthony Meli, and Warden Brian Foster**

Finally, summary judgment in favor of Westra, Meli, and Foster is appropriate because none of these defendants knew about Whitelaw's safety concerns prior to the fight. In the complete absence of subjective knowledge of a significant risk of harm to an inmate, prison officials cannot be liable for failing to protect that inmate from the unknown harm. *See Farmer*, 511 U.S. at 836–37. As WCI's SPN Captain, Westra receives a written request from every inmate at the prison who desires an SPN arrangement, but following Whitelaw's release from the RHU, there is no record that he ever submitted an SPN request for Westra to investigate. DPFOF ¶¶ 30, 38. Because Whitelaw never filed an SPN request, Meli likewise never received an SPN decision from Westra to review. *Id.* ¶ 48. Separate from the SPN process, Foster never received any correspondence from Whitelaw notifying the Warden's office of his concern prior to the fight. *Id.* ¶ 51. Although each of these three defendants became aware of Whitelaw's safety fears *after* his June 6, 2016 fight, that subsequent knowledge of his concern did not retroactively place them on notice of Whitelaw's alleged risk of serious harm. Consequently, the record also supports the entry of summary judgment in favor of these three defendants on Whitelaw's failure to protect claims.

## CONCLUSION

For the reasons set forth above, the defendants' motion for summary judgment will be **GRANTED**. Although the defendants raise the defense of qualified immunity in their brief in support of their motion for summary judgment, the court need not reach that issue because summary judgment is appropriate based on Civil Local Rule 7(d), as well as the record before the court with regard to Whitelaw's failure to protect claim.

Dated this <u>6th</u> day of January, 2018.

s/ William C. Griesbach<br>
William C. Griesbach, Chief Judge<br>
United States District Court